IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| D.W., | Case No. 3:21-cv-571-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **FRESENIUS MEDICAL CARE NORTH AMERICA**, | |
| Defendant. | |

Thomas Stenson and Emily Cooper, DISABILITY RIGHTS OREGON, 511 S.W. 10th Avenue, Suite 200, Portland, OR 97205. Of Attorneys for Plaintiff.

Alexander A. Wheatley, FISHER & PHILLIPS, LLP, 111 S.W. Fifth Avenue, Suite 3030, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff D.W.[1] is an Astoria, Oregon resident with an intellectual disability as well as

brain damage resulting from several strokes. D.W. also suffers kidney failure and will die

without regular dialysis treatment. Defendant Fresenius Medical Care North America (Fresenius)

operates dialysis treatment clinics, including in Astoria and St. Helens, Oregon. On March 13,

---

[1] The Court granted Plaintiff's Motion to Proceed Pseudonymously (ECF 7) on April 16, 2021. ECF 9.

2021, Fresenius gave D.W. 30-days notice that it would no longer provide him dialysis treatment at either location because Fresenius staff felt unsafe around D.W. after D.W.'s disruptive outburst at the Fresenius's St. Helens clinic on March 9, 2021 and D.W.'s prior racially offensive outbursts at Fresenius's Astoria clinic. D.W. alleges that Fresenius is denying him dialysis treatment because of behavior caused by his disability, in violation of the Americans with Disabilities Act (ADA), 42 U.S. § 12181 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794.

Before the Court is D.W.'s Motion for Temporary Restraining Order (ECF 2). D.W. asks the Court to order Fresenius to keep treating D.W. at either its Astoria or St. Helens facility. At this stage of the litigation, the Court finds that D.W. is likely to prevail on the merits of his disability discrimination claim, will suffer irreparable harm without dialysis treatment, and the balance of the equities and public interest favor D.W. Accordingly, the Court grants D.W.'s motion.

## STANDARDS

In deciding whether to grant a motion for temporary restraining order (TRO), courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

PAGE 2 – OPINION AND ORDER

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

In addition, a TRO is necessarily of a shorter and more limited duration than a preliminary injunction.[2] Thus, the application of the relevant factors may differ, depending on whether the court is considering a TRO or a preliminary injunction.[3] Indeed, the two factors most likely to be affected by whether the motion at issue is for a TRO or a preliminary injunction are the "balancing of the equities among the parties" and "the public interest." Finally, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual

---

[2] The duration of a TRO issued *without* notice may not exceed 14 days but may be extended by a court once for an additional 14 days for good cause, provided that the reasons for the extension are entered in the record. Fed. R. Civ. P. 65(b)(2). When a TRO is issued with notice and after a hearing, however, the 14-day limit for TROs issued without notice does not apply. *See Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 n.1 (D. Or. 2016), citing *Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F. Supp. 360, 368 n.12 (N.D. Ill. 1984). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id.* Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a TRO.

[3] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses towards its conclusion. *See Pac. Kidney*, 156 F. Supp. 3d at 1222 n.2.

development, the rules of evidence do not apply strictly to preliminary injunction proceedings."
*Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc*., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013);
*see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND

D.W., a 53-year-old resident of Astoria, Oregon, suffers renal failure; his kidneys are
incapable of fully cleaning toxins from his bloodstream. D.W. undergoes dialysis treatment
multiple times per week in a dialysis clinic. The treatment which removes toxins in D.W.'s blood
through an hours-long process of removing D.W.'s blood, filtering impurities in the blood, and
then reinjecting the blood into D.W.'s bloodstream. The process involves needles, a problem
because needles make D.W. anxious.[4] D.W.'s physician states that, without regular dialysis
treatment, D.W. would die within two to four weeks. D.W., however, has at times missed several
dialysis appointments in a row.

D.W. has disabilities that affect his behavior. Although D.W. consistently denies that he
has mental health issues, he has an intellectual disability—his functional IQ is 64—and brain
damage from several major strokes that D.W. suffered two decades ago. These disabilities impair
D.W.'s ability to process difficult concepts, regulate his emotions, and respond appropriately to
stressors. D.W.'s disabilities can cause him to act aggressively and impulsively. Indeed, in
July 2020 a nurse practitioner reviewing D.W.'s CT scans noted that the scan "shows stroke and
encephalomalacia. This is likely what causes the patient's mood disturbance and behaviors." *See*
Stenson Decl., Ex. 6 (EFC 11-1) at 1. At least one hospital record noted that D.W. had a medical
history of schizophrenia.

---

[4] Another form of dialysis is Peritoneal Dialysis (PD). PD works through the patient's
stomach lining, not intravenously. PD does not involve needles and can be done from the home,
rather than from a clinic.

D.W. also suffers seizures. D.W. takes Dilantin to treat his seizures. D.W.'s medical

providers have recommended he discontinue Dilantin because its side effects can include

irritability, aggression, and violent impulses. D.W., however, has declined to discontinue

Dilantin.

Fresenius "provide[s] dialysis care and related services to persons who suffer from end-

stage renal disease" through thousands of dialysis clinics across the country. ECF 1 at 3, ¶ 6.

D.W. alleges that nearly a third of Fresenius's profits are from healthcare programs funded by

the United States government (mostly Medicaid and Medicare). In November 2018, D.W. began

dialysis treatment at Fresenius's Astoria, Oregon location (Fresenius Astoria). Fresenius Astoria

staff were aware of D.W.'s disabilities and his associated impairments. D.W. was verbally

abusive to—and directed racial slurs at—Fresenius Astoria staff many times in 2018 and 2019.

*See* Stenson Decl., Ex. 8 (ECF 3-8) at 1. During one D.W. outburst in July 2019, Fresenius

Astoria staff called the police. Fresenius Astoria staff later spoke with D.W. about appropriate

behavior, role played with D.W. to help D.W. practice appropriate language, and had D.W.

identify activities that reduced his anxiety. These interventions did "decrease . . . some negative

behaviors for a time." Stenson Decl., Ex. 8 (ECF 3-8) at 1.

In May 2020, D.W. had two outbursts that led to his discharge from Fresenius Astoria.

First, during a May 6, 2020 outburst, D.W. told his Patient Care Technician (PCT), who was

Asian-American, that she caused the Covid-19 pandemic; D.W. also threw his facemask at her.

Eventually, D.W. became so belligerent that police removed him from the facility. On May 8,

2020, a social worker at Fresenius Astoria met with D.W. and "educated [D.W.] regarding safety

for the entire clinic." Stenson Decl., Ex. 5 (ECF 10-1) at 15. D.W. left that meeting aware that "if

another incident like [the May 6, 2020 incident] happen[s] he would have the 'adult

consequences' of being kicked out—involuntarly [*sic*] being discharged." *Id.* On May 11, 2020,

Fresenius Astoria gave D.W. a letter describing "expected behaviors and how staff will work

with him if he has a hard time." ECF 1 at 6; *see also* Stenson Decl., Ex. 5 (ECF 10-1) at 12.

Second, on May 22, 2020, D.W. was verbally abusive to a nurse who asked D.W. to clarify a

question the nurse had not understood. ECF 1 at 6; *see also* Stenson Decl., Ex. 5 (ECF 10-1) at 9.

Fresenius Astoria staff met with D.W. about this outburst on May 27, 2020.

On May 29, 2020, Fresenius Astoria informed D.W. that it was discharging him for

"behavior that is disruptive and abusive to the extent that it impairs the delivery of care to you or

the ability of the facility to operate effectively. This behavior includes your response to staff

when denying medications, swearing, yelling, hitting facility property, and making racial slurs

towards the staff." Stenson Decl., Ex. 4 (ECF 3-4) at 1. The letter states that Fresenius Asotria

"provided you with education about your patient rights and responsibilities," "granted [you] the

ability to pick you[r] chair, and treatment time" and often "granted [you] the ability to pick the

PCT whom you would like to work with." The letter identifies outbursts on May 22, May 25, and

May 27, 2020. The letter also explains that "[a]ssitance will be provided to you to arrange for

your care at another facility" and provides the addresses of nearby dialysis clinics. *Id.*

D.W.'s behavior worsened after Fresenius informed he that he would be discharged from

Fresenius Astoria. On June 3, 2020, D.W. threatened to harm another patient and again hurled

racial epithets and blame for the COVID-19 pandemic at Asian-American staff members. D.W.

was escorted out of the facility, but not before directing racial epithets and violent threats at one

staff member, charging at another staff member, trying to strike the Facility Administrator, and

shoving a police officer.

In September 2020, D.W. was admitted to care at Fresenius's St. Helens location (Fresenius St. Helens). Aware of D.W.'s outbursts at Fresenius Astoria, Fresenius St. Helens informed D.W. via a September 8, 2020 letter that they "expected him to comply with rules and notify staff before he became angry and upset." Wheatley Decl., Ex. 7 (ECF 17-7) at 1. Fresenius St. Helens scheduled D.W.'s visits in a way that allowed him to more easily commute from Astoria, required D.W. to have a personal caregiver who is not employed by Fresenius attend D.W.'s treatment sessions, and appears to have hired a security guard for more protection. D.W. had no incidents at Fresenius St. Helens for six months, though he often missed appointments during that time and had offsite incidents that led at least one caregiver and several Medicare rideshare drivers to refuse to continue serve him.

On March 9, 2021 a mishap with a blood pressure cuff at Fresenius St. Helens provoked an outburst from D.W. The blood pressure cuff began to inflate and deflate rapidly, causing D.W. discomfort. D.W. asked both Fresenius St. Helens staff and his caregiver to assist him. A Fresenius St. Helens staff person told D.W. she would assist him after assisting another patient, but then left the room. D.W. began to yell and curse. His caregiver tried to calm him, but D.W. simply turned his ire toward her. D.W. then stood up and attempted to leave with needles still in his arm, risking serious bodily harm to himself.[5] Ultimately, police escorted D.W. from the facility.

On March 11, 2021, Fresenius's medical director authorized Fresenius St. Helens to discharge D.W. On March 13, 2021, Fresenius St. Helens informed D.W. in writing that he would be discharged on April 13, 2021 because of his outburst on March 9, 2021. The letter

---

[5] Defendant's Response explains that D.W.'s behavior was "extremely dangerous because, while undergoing dialysis, the patient's blood system is pressurized, and, if a needle were to be pulled out, the patient could very quickly bleed to death." Def.'s Resp. (ECF 16) at 9.

states that D.W. "cursed, yelled, and attempted to strike your caregiver." Stenson Dec., Ex. 3

(ECF 3-3) at 1. D.W.'s caregiver, however, has no recollection of D.W. trying to strike her. D.W.

continued to receive dialysis treatment at Fresenius St. Helens without incident until April 13,

2021.

On April 9, 2021, D.W.'s attorney asked Fresenius to postpone D.W.'s discharge date to

May 15, 2021 and to participate in discussions about possible accommodations that would allow

D.W. to continue treatment. On April 12, 2021, Katelynn Hemmele, a local Fresenius

administrator, replied to D.W.'s attorneys. Hemmele declined both to postpone D.W.'s discharge

date and to discuss further accommodations. Hemmele stated that D.W. "is being discharged

because he has caused a risk of safety to our other patients and staff." Stenson Decl., Ex. 2

(ECF 3-2) at 1. Hemmele also explained:

> We have attempted to accommodate the patient's needs but those
> attempts have been unsuccessful, due to the patient's behavior or
> to the limits of the facility and staff. More specifically, we have
> offered to change the patient's dialysis time but the patient
> declined to accept the change. We are not able to alter the physical
> space in which he receives services due to the layout of the clinic.
> Similarly, we are not able to increase staff attention for him due to
> our staffing requirements and the need to provide care to all of our
> patients. We have attempted to help the patient locate a facility
> closer to his home, but he has been rejected by the available clinics
> due to his history of behavioral issues or because he has not
> complied with their admissions requirements. We have also
> attempted to ensure he has someone to support him during
> treatment by requiring the presence of a caregiver but that has not
> prevented the patient from behaving in a manner that caused safety
> concerns that led to his discharge. As a result, we believe we have
> attempted to make reasonable accommodations for the patient.

*Id.*

On April 13, 2021, D.W. was discharged from Fresenius St. Helens. D.W. reports that

most other dialysis clinics will not accept him because of negative reports from Fresenius about

his behavior. A DaVita dialysis clinic in Hillsboro, Oregon, however, is at least considering

PAGE 8 – OPINION AND ORDER

admitting D.W. and has requested D.W.'s admission paperwork and the results of a tuberculous test. D.W. has not yet provided the DaVita clinic with those test results. The only other nearby facilities offering dialysis treatment are hospitals in Longview, Washington, and Portland, Oregon. Those hospitals, however, only offer emergency—not routine—dialysis treatment. D.W. has not received dialysis treatment since April 13, 2021. The Court held a hearing on D.W.'s motion on Tuesday, April 20, 2021 at 9:30 a.m.

## DISCUSSION

D.W. urges the Court to grant his TRO because he has shown that he is likely to succeed on the merits of his disability discrimination claims under the ADA and Rehabilitation Act, will suffer irreparable harm—indeed, death or hospitalization—without the TRO, and the balance of the equities and public interest favor a TRO. Alternatively, D.W. argues that he raised substantial questions on the merits and has shown a severe risk of irreparable harm.

Fresenius argues that it has not discriminated against D.W. on the basis of his disabilities because: (1) D.W.'s outbursts are not the product of his disabilities; (2) Fresenius was unaware of D.W.'s disabilities; and (3) Fresenius discharged D.W. only because it determined that D.W. posed a significant risk of harm to Fresenius's staff and other patients after conducting an individualized assessment of D.W. based on objective evidence. Thus, Fresenius argues, D.W. cannot establish a likelihood of success on the merits. Fresenius also argues that D.W. cannot show a substantial risk of irreparable harm because Fresenius has arranged for D.W. to begin treatment at a nearby facility, but D.W. has refused to provide that facility with the necessary tuberculosis test results. Finally, Fresenius argues that the balance of equities and public interest disfavor granting D.W. a TRO.

**A. Likelihood of Success on the Merits**

D.W. is likely to succeed on the merits of his disability discrimination claims. D.W.

brings claims under both Title III of the ADA[6] and the Rehabilitation Act. Because Congress

modeled the ADA after the Rehabilitation Act, "[t]here is no significant difference in analysis of

the rights and obligations created by the [acts]." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041,

1045 n.11 (9th Cir. 1999). The Court analyzes D.W.'s claims under both acts together. *See*

*O'Guinn v. Nev. Dep't of Corr.*, 468 F. App'x 651, 652 (9th Cir. 2012).

Title III of the ADA prohibits public accommodations from "discriminat[ing] against [an

individual] on the basis of disability in the full and equal enjoyment of the goods, services,

facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(a). The Rehabilitation

Act prohibits the same conduct by private organizations that receive federal funds. 29 U.S.C.

§ 794(a). "To prevail on a discrimination claim under Title III, a plaintiff must show that: (1) he

is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases,

or operates a place of public accommodation; and (3) the plaintiff was denied public

accommodations by the defendant because of his disability." *Arizona ex rel. Goddard v. Harkins*

*Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2010).

---

[6] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Fortune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001)). Because Title I and Title III contain parallel provisions, cases from one context can clarify the other. *See Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).

Public accommodations include the "professional office of a health care provider." 42 U.S.C. § 12181(7)(F).[7] A disability is "a physical or mental impairment that substantially limits one or more major life activities." *Id.* § 12102. Major life activities include "the operation of an individual organ," 28 C.F.R. § 36.105(c)(1)(ii), and the ability to "interact[] with others," *id.* § 36.105(c)(1)(i). [8] Some conditions are predictably disabling; for example, federal regulations provides that "[i]ntellectual disability substantially limits brain function." *Id.* § 36.105(d)(2)(iii)(C). "Conduct resulting from a disability is considered to be part of the disability. . . ." *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001). An establishment that is unaware of an individual's disability has not discriminated against the individual because of the individual's disability. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996).

Establishments discriminate because of an individual's disability not only when they deny services to an individual because of the individual's disability, but also when they refuse to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities," 42 U.S.C. § 12182(b)(2)(A)(ii); 45 C.F.R. § 84.6(c)(ii). After an individual requests an accommodation, the establishment must engage in "an interactive process . . . to determine the appropriate reasonable accommodation." *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). The interactive process

---

[7] Similarly, the Rehabilitation Act applies private organizations that are "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 29 U.S.C. § 794(b)(3)(A)(ii).

[8] Any person with a disability as defined in the ADA is also disabled under the Rehabilitation Act. 29 U.S.C. §§ 705(20)(B), 794(a).

should involve "an individualized inquiry" about "whether a specific modification . . . would be reasonable under the circumstances as well as necessary." *PGA Tour, Inc.*, 532 U.S. at 688. "[T]he duty to accommodate 'is a "continuing" duty that is "not exhausted by one effort."'" *Humphrey*, 239 F.3d at 1138 (quoting *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999)). An individual is not, however, entitled to the accommodation he requests or prefers. *U.S. E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1111 (9th Cir. 2010).

Anti-discrimination laws do not, however, require an establishment to "permit an individual to participate in" its services when that "individual poses a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3).[9] An individual who poses a "significant risk to the health or safety of other that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services," is a "direct threat." *Id.* "In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practice, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 36.208(b).

"Because it is an affirmative defense, the burden of establishing a direct threat lies with the [establishment]." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1027 (9th Cir. 2003). That burden is a "heavy" one. *Lockett v. Catalina Channel Exp., Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007). "[C]ourts should assess the objective reasonableness of the views of health care

---

[9] The same provision appears in the portions of the ADA prohibiting employment discrimination. 42 U.S.C. §§ 12111(3), 12113(b). This opinion also draws on case law interpreting those provisions.

professionals [that an individual poses a direct threat to the health and safety of others] without deferring to their original judgments." *Bragdon*, 524 U.S. at 650. "A subjective belief in the existence of a risk, even one made in good faith, will not shield the decisionmaker from liability." *Echazabal*, 336 F.3d at 1028.

Fresenius does not dispute that it is a public accommodation under Title III of the ADA or a covered program or activity under the Rehabilitation Act. Fresenius does, however, dispute that D.W.'s behavior was the product of his disability and that Fresenius was aware of D.W.'s disability. Both arguments fail. Fresenius emphasizes that a medical provider attributed D.W.'s mood disturbances to side effects from Dilantin, a medication D.W. takes to combat seizures. Other evidence in the record, however, strongly suggests that D.W.'s intellectual disability and stroke-induced brain damage cause his disruptive outbursts. Federal regulations, for example, explain that intellectual disability predictably impairs brain function. 28 C.F.R. § 36.105(d)(2)(iii)(C). No great leaps of logic are required to find that an individual with impaired brain function might struggle to respond appropriately to others, particularly in stressful or uncomfortable situations. Moreover, another medical provider opined that it was the brain damage D.W. suffered from his stroke that "is likely what causes [D.W.]'s mood disturbance and behaviors." Stenson Decl., Ex. 6 (ECF 11-1) at 1. The Court therefore concludes that D.W.'s disruptive behavior is the product of his disability. *Humprey*, 239 F.3d at 1139-40 ("Conduct resulting from a disability is considered to be part of the disability. . . .").

Fresenius's argument that is was unaware of D.W.'s disability is equally unavailing. The record teems with Fresenius's acknowledgements that D.W. suffered mental health impairments. One Fresenius form noted that D.W. had a history of schizophrenia and seizure disorder and that D.W. needed to see a primary care physician about other mental health issues. Stenson Decl.,

PAGE 13 – OPINION AND ORDER

Ex. 8 (ECF 3-8) at 1. Fresenius Astoria staff often met with D.W. about what they identified as

"[m]ental [h]ealth [c]oncerns." *See, e.g.*, Stenson Decl., Ex. 5 (10-1) at 1, 3, 6, 12. The same staff

recommended that D.W. begin Xanax to treat his fear and anxiety. *Id.* at 12. Even if Fresenius

did not know that D.W. was disabled before, it knows now—and is denying him treatment based

on behaviors that stem from that disability.

Finally, Fresenius argues that D.W. posed a "direct threat" to the safety of staff and

patients. Fresenius, however, has not satisfied the "heavy" burden of establishing that D.W. is a

direct threat. *Lockett*, 496 F.3d at 1066. Fresenius points to a March 11, 2021 letter by Fresenius

medical director Dr. Monika Patel authorizing Fresenius St. Helens to involuntarily discharge

D.W. as evidence that Fresenius made an individualized, objective-evidence based assessment of

the threat D.W. poses to the health and safety of others. The direct threat assessment, however,

requires the establishment to consider the imminence, likelihood, severity, and duration of the

harm posed by a disabled individual. *Echazabal*, 336 F.3d at 1027. Aside from conclusively

declaring that D.W. is experiencing "increased" and "worsening agitation," Dr. Patel does not

assess the risk D.W. *prospectively* poses. *See* Wheatley Decl., Ex. 13 (17-12) at 1. Dr. Patel notes

that D.W.'s March 9, 2021 outburst "caused significant stress on [Fresenius] staff and patients"

and notes that D.W. was under a "zero tolerance" policy. *Id.*  Dr. Patel does not, however,

discuss whether it is likely that D.W. will have another outburst, how soon D.W. may have

another outburst, or how severe the next outburst might be. Describing one incident of

misconduct and noting that an individual was under a "zero tolerance" policy is not an

assessment of the *future* risk of harm that D.W. poses.

The discharge decision Fresenius provided D.W. fares no better. There, Fresenius

explains that D.W. is being discharged because he "cursed, yelled, and attempted to strike your

caregiver." Stenson Decl., Ex. 3 (ECF 3-3) at 1. D.W. disputes that he tried to strike his

caregiver. Even assuming D.W. did try to strike his caregiver, the discharge letter is insufficient.

Again, the discharge letters offers no evidence that Fresenius considered the *prospective* risk of

harm D.W. poses.

Fresenius suggests that D.W.'s history of outbursts at Fresenius Astoria, as well as the

fact that D.W. scared off caregivers and Medicare-funded rideshare drivers, factored into its

direct threat assessment. Past can be prologue;[10] D.W.'s behavior toward other healthcare and

healthcare-adjacent providers is therefore some evidence that D.W. posed a prospective risk of

harm. Still, the March 9, 2021 outburst was D.W.'s only outburst in more than six months at

Fresenius St. Helens. Indeed, Fresenius St. Helens allowed him to continue treatment for more

than a month after the incident. That suggests that Fresenius St. Helens did not think that D.W.

posed a particularly imminent or severe threat of harm. And, for what it is worth, D.W.'s

appointments after March 9, 2021 occurred without apparent incident.

Fresenius fails to show that it considered whether reasonable accommodations could

allow D.W. to continue treatment without posing a direct threat to others. Fresenius disagrees,

listing the accommodations it offered D.W. when he transferred from Fresenius Astoria to

Fresenius St. Helens, including allowing him to select his PCT and requiring him to bring a

caregiver to his appointment. Fresenius's invocation of pre-March 9, 2021 accommodations

---

[10] Fresenius argues that past acts or threats of violence, especially recent acts or threats, can support an establishment's determination that an individual poses a direct threat, citing *Den Hartog v. Wasatch Academy*, 129 F.3d 1075 (10th Cir. 1997). That recent acts or threats of violence show that an individual poses a direct threat to safety is an uncontroversial proposition. The relevant question, however, is whether the establishment (or employer) assessed the likelihood, imminence, duration, and severity of *future* harm based on those past acts. In *Den Hartog*, the Tenth Circuit concluded an employer had conducted such an assessment because the employer relied on a state court judge's determination that the individual "posed 'an immediate danger of physical injury' to himself or others." 129 F.3d at 1079.

misses the point. The duty to provide reasonable accommodations is an ongoing duty not satisfied by an establishment's previous attempts to accommodate a disabled individual. *Humphrey*, 239 F.3d at 1138. Fresenius was specifically required to consider whether accommodations could mitigate the risk Fresenius identified after the March 9, 2021 incident. *See* 28 C.F.R. § 36.208. Fresenius does contend that it offered D.W. one accommodation after March 9, 2021 but before discharging him: Fresenius proposed allowing D.W. to dialyze earlier in the day when there are fewer patients present. D.W., Fresenius asserts, declined that accommodation. The record, however, contains no evidence of Fresenius offering or D.W. declining this accommodation. Based on the evidence before it, the Court cannot conclude that Fresenius considered whether any reasonable accommodation might mitigate the risk posed by D.W.

None of this is to say that Fresenius's conclusion that D.W. posed a direct threat was not made in good faith. The Court does not doubt that D.W.'s disruptive, often racially offensive, sometimes aggressive, outbursts prompted stress, anxiety, and even fear in the Fresenius staff and patients who witnessed the outbursts. Establishments carry a heavy burden, however, when demonstrating that an individual poses a direct threat. *Lockett*, 496 F.3d at 1066. The establishment's good-faith belief that the individual poses a direct threat does not satisfy this burden. *Echazabal*, 336 F.3d at 1028. The ADA requires a more particular showing. This is understandable given the history of discrimination against disabled individuals that the ADA sought to remedy. Fresenius has not shown that D.W. was a direct threat. The Court thus finds that D.W. has shown a likelihood of success on the merits.

**B.  Likelihood of Irreparable Harm**

D.W. argues that he will experience irreparable harm absent a TRO because, without dialysis treatment, he will die in two-to-four weeks. Fresenius argues that D.W. does not face a substantial risk of irreparable harm because D.W. has treatment alternatives.

The parties do not dispute that D.W. has not received dialysis treatment in the past week nor that, after two-to-four weeks without dialysis treatment, D.W. faces a substantial risk of hospitalization or even death. Death and hospitalization are irreparable harms. *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093 (9th Cir. 2020) ("There is a significant likely that the individual plaintiffs will suffer irreparable harm if the [Migration Protection Protocol (MPP)] is not enjoined. . . . [N]on-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) ("Plaintiffs . . . very likely will suffer irreparable harm . . . . This harm includes pain, infection, amputation, medical complications, and death due to delayed treatment.").

Fresenius argues that the risk of that harm is not substantial because several treatment alternatives are available to D.W. Most notably, Fresenius says that it has arranged for D.W. to be treated at a DaVita clinic in Hillsboro, Oregon. The only reason D.W. is not already receiving treatment there, Fresenius contends, is that D.W. has not submitted a tuberculous test. Although the DaVita clinic is a promising lead, it is uncertain whether DaVita will accept D.W. The record reveals only that DaVita requested D.W.'s admission paperwork and said it was "waiting for a [tuberculous] test." Wheatley Decl., Ex. 13 (ECF 15-8) at 1-2. It is not obvious that DaVita will accept D.W. once they receive his test results. Given that D.W. has already gone a week without dialysis, the Court finds that the DaVita Hillsboro lead does not ameliorate the substantial risk of

irreparable harm to D.W. Still, the Court orders D.W. to pursue placement at DaVita's Hillsboro clinic.

Fresenius also suggests another alternative: PD treatment through a clinic in Long Beach, Washington is another alternative. The parties agree that, long term, PD is an ideal solution for D.W. For now, however, the PD treatment is even less certain an alternative than the DaVita clinic. Thus, the PD treatment lead also does not ameliorate the substantial risk of irreparable harm to D.W.

That leaves emergency dialysis treatment in hospitals in Longview, Washington, or Portland, Oregon. D.W., however, requires routine—not emergency—dialysis treatment. Moreover, these alternatives represent hospitalization, itself an irreparable harm. These alternatives, thus, do not ameliorate the substantial risk of irreparable harm to D.W. Accordingly, the Court finds that D.W. has shown that he is likely to suffer irreparable harm absent a TRO.

## C. Balance of the Equities and Public Interest

The Court considers the balance of the equities and the public interest together. *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell–Jolly*, 572 F.3d 644, 657-58 (9th Cir.2009) (vacated in part, on other grounds). In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). The court must also consider "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Indep. Living Ctr. of S. Cal., Inc.*, 572 F.3d at 659.

Here, both sides have compelling interests. The risk of serious bodily harm to D.W. increases with each day D.W. does not receive dialysis treatment. Moreover, both D.W. and the public have "a strong interest in promoting the equality of all persons." *Tamara*, 964 F. Supp. 2d at 1088. Fresenius's interest is also strong. Fresenius must ensure its employees are safe and free

from harassment. Those obligations extend to the Fresenius's other patients, as well. Dialysis is a long and uncomfortable procedure. Fresenius's efforts to make dialysis as comfortable for patients as possible is an important part of its operations.

The balance of the equities nevertheless favors D.W. Fresenius's concerns that D.W. poses a direct threat of harm are "much more speculative than the probable injury the chronically ill [D.W.] face[s] absent" a TRO. *See Harris*, 366 F.3d at 766. The Court also notes that, courts that have found a direct threat have nevertheless refused to permit a healthcare provider to deny treatment altogether. *See Roe v. Providence Health Sys.*, 655 F. Supp. 2d 1164, 1168-69 (D. Or. 2009) ("I am unwilling to force the Hospital into an unmanageable situation. I am also unwilling, however, to prevent the Roes from seeking care at Providence facilities. The unmanageable issues are centered on Roe's use of a service animal. Without a service animal, I believe that Roe would only cause challenges to the Hospital's staff that they deal with when treating many difficult patients.").

Fresenius disagrees. It contends that the equities favor protecting its staff from the stress and fear created by D.W.'s presence. Fresenius relies on *Mayo v. PCC Structurals, Inc.*, 795 F.3d 941 (9th Cir. 2015) for the proposition that employers cannot be required to choose between accommodating disabled individuals and protecting its staff. *Mayo*, however, held that the employer had not discriminated because of the employee disability by firing the employee for making violent threats because "[a]n employee whose stress leads to serious and credible threats to kill his co-workers is not *qualified* to work for the employer." 795 F.3d at 944 (emphasis added).[11] *Mayo*, then,

---

[11] Moreover, the threat of harm posed by the employee in *Mayo* was far more severe, imminent, and likely to occur than is the threat posed by D.W. In *Mayo*, the employee told at least three co-workers that he wanted to bring a gun to work and kill his supervisors. *Mayo*, 795 F.3d at 942-43. He told one co-worker not to worry because "she would not be working the shift when the killing would occur." *Id.* at 942. When a human resources manager asked the employee if he planned to carry out the threats, the employee said that "he couldn't guarantee he wouldn't

did not turn on what accommodations were reasonable or even whether the employee was disabled and is therefore of limited relevance to the balance of the equities here. The Court finds that the balance of the equities and the public interest favor granting a TRO.

## D.  Bond

Federal Rule of Civil Procedure 65 instructs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion over the amount of security and may even dispense with the security requirement altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.' In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" (emphasis and alteration in original) (citation omitted) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003))); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("'The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.'" (quoting *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985))).

D.W. requests that the Court waive the bond requirement. Given D.W.'s "unremarkable" financial means, *see Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) *supplemented by* 236 F.3d 1115 (9th Cir. 2001), the Court's finding that D.W. has a likelihood of

---

do that." *Id.* at 943. When police investigated the threats, the employee told police that he owned guns, but "had not decided which gun to use." *Id.*

success on the merits, and the relative hardships, the Court finds that to require any security

would effectively deny D.W. access to judicial review. Thus, the Court does not require a bond

**CONCLUSION**

Because the Court finds that D.W. has shown a likelihood of success on the merits, a

likelihood of irreparable harm absent a TRO, and that the balance of the equities and the public

interest favor granting a TRO,[12] the Court **GRANTS** D.W.'s Motion for Temporary Restraining

Order (ECF 2) as follows:

**TEMPORARY RESTRAINING ORDER**

1.    Defendant shall continue to regularly treat Plaintiff at its dialysis clinic in St.

Helens facility, or another mutually-agreeable facility. To accommodate Defendant's safety

concerns, Plaintiff must undergo dialysis treatment at a reasonable time identified by Defendant

and must be accompanied by a caregiver unaffiliated with Defendant for each of his treatment

sessions.

2.    Plaintiff shall continue to seek treatment at facilities other than Defendant's

facilities, including DaVita Dialysis Hillsboro. Specifically, Plaintiff must comply with all

DaVita's reasonable requests related to Plaintiff applying for and, if applicable, beginning

treatment at DaVita. Plaintiff must report to the Court his progress in seeking treatment at a

facility other than Defendant's facilities by 5 p.m. on Friday, April 23, 2021.

---

[12] The Court finds, in the alternative, that D.W. has shown that "there is a likelihood of
irreparable injury to plaintiff; there are serious questions going to the merits; the balance of
hardships tips sharply in favor of the plaintiff; and the [TRO] is in the public interest." *See M.R.
v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

3.      Defendant shall engage in an interactive process with Plaintiff to identify reasonable accommodations that would permit Plaintiff to receive dialysis treatment at Defendant's clinic.

4.      The Court authorizes reasonable and mutual expedited discovery so that the parties can be fully prepared to present all relevant facts and legal issues at a preliminary injunction hearing. The parties should seek to resolve any discovery disputes themselves but may contact the Courtroom Deputy should the parties require the Court's assistance.

5.      This Order expires fourteen (14) days after entry. The Court will hold a hearing to determine whether to continue the TRO for an additional 14 days on Tuesday, May 4, 2021 at 9:30 a.m. in Portland, Courtroom 15B, before Judge Michael H. Simon.

**IT IS SO ORDERED**.

DATED this 20th day of April, 2021 at 3:00 p.m.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge